LONG ISLAND GASOLINE RETAILERS ASSOCIATION, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Long Island Gasoline Retailers Asso. v. Commissioner
Docket No. 3145-79.
United States Tax Court
T.C. Memo 1982-136; 1982 Tax Ct. Memo LEXIS 606; 43 T.C.M. (CCH) 815; T.C.M. (RIA) 82136; March 22, 1982. Burton Rothbard, for the petitioner. Agatha L. Vorsanger and Jani E. Maurer, for the respondent. WHITAKER
MEMORANDUM OPINION WHITAKER, Judge:* The Commissioner determined Federal income tax deficiencies against petitioner of $ 784.74, $ 1,129.48, $ 2,966.40 and $ 3,206.20 for the years 1973, 1974, 1975 and 1976, respectively. The only issue for decision is whether petitioner's net income from sponsoring and administering group insurance plans was unrelated business taxable income. All the facts have been stipulated and are found accordingly. Petitioner is a corporation *608 whose principal office was located in Jericho, N.Y., at the time the petition was filed in this case. Petitioner filed a Return of Organization Exempt From Income Tax, Form 990, for each of the taxable years 1973, 1974, 1975 and 1976 with the Internal Revenue Service Center at Philadelphia, Pa., but it did not file any Form 990-T reporting unrelated business income in any of these years. Petitioner is a business league not organized for profit and no part or its net earnings inures to the benefit of any private shareholder of individual; therefore, it is an exempt organization under section 501(c)(6). [1] The members of petitioner are retail gasoline station owners, both individual and corporate, in the Counties of Kings, Queens, Nassau and Suffolk in New York State. During each of the years in issue, petitioner had approximately 857 members. The purpose of petitioner, as stated in Article I, Section II, of petitioner's constitution, is: To join all gasoline retail dealers in Nassau, Suffolk, Queens and Kings Counties, under [its] sole leadership * * *, to bring *609 about concerted participation and unified direction resulting in undivided strength for the effective and successful psursuit of a better life and future of all gasoline dealers. The objectives of petitioner are set forth in Article II of its constitution, which states that the goals of the association will remain consistent with its purposes and are flexible and continually updated to conform to the changing conditions in the industry, and that its goals include, but are not restricted to, the following: To promote and maintain better trade relations among the retail gasoline dealers of Long Island, N.Y.; to secure freedom from unjust, unlawful, and unfair trade practices; to dismmeminate accurate and reliable information as to the standing and character of customers and to settle differences between members and between members and supply houses; to promote a spirit of goodwill and a high standard of business practices among its members; to require each member to live up to these objectives and to assist and cooperate in all activities and functions of the association; to secure recognition of the Long Island Gasoline Retailers Association, Inc., Dealer Brand Name Council and to *610 act in conjunction with oil suppliers to improve dealer-company relations; to obtain equitable leases; to secure the dealer's right to a hearing by an impartial panel before cancellation of a lease; to prevent harassment and/or coercion in prices, leases, etc., violative of a member's civil rights; to obtain a vested right for the dealer's recovery of goodwill; to help protect the consumer's interest by securing the establishment of equal marketing policies regarding tankwagon prices; and to cooperate with local, State and Federal agencies and to urge fair legislation for dealers. During the years in issue, petitioner offered its members and their employees the opportunity to subscribe to Blue Cross/Blue Shield medical insurance plans. Approximately 3,000 individuals subscribed to these plans. Approximately 488 of these subscribers were either individuals who owned gas stations or shareholders of corporations that owned gas stations. These individuals and corporations owning gas stations were members of petitioner. Approximately 2,512 of the subscribers to the Blue Cross/Blue Shield medical insurance plans were employees of petitioner's members. This represented between 55 percent *611 and 60 percent of the total number of individuals employed by petitioner's members. Petitioner not only sponsored the Blue Cross/Blue Shield insurance plans but also regularly carried on the business of administering the plans by performing certain administrative services of the type ordinarily provided in the commercial market by insurance brokers. The tasks undertaken by petitioner in administering the plans included: Filing of enrollment forms for eligible individuals with Blue Cross/Blue Shield; assisting in the processing of claims; advising eligible individuals as to which of several plans offered was most suitable for them; and collecting premiums due and forwarding these premiums to Blue Cross/Blue Shield. For its administration of the insurance plans, petitioner collected fees from benefits paid to recipients of $ 30,945 in 1973; $ 37,857 in 1974; $ 53,000.64 in 1975; and $ 55,624.48 in 1976. In administering the plans, petitioner incurred expenses of $ 26,378 in 1973; $ 31,723 in 1974; $ 37,168 in 1975; and $ 38,593 in 1976. Accordingly, petitioner's net profits from its administration of the insurance plans were $ 4,567 in 1973; $ 6,134 in 1974; $ 15,832.64 in 1975; *612 and $ 17,031.48 in 1976. The fees collected by petitioner for its administration of the Blue Cross/Blue Shield benefits accounted for the following percentages of petitioner's total receipts: 20 percent in 1973; 21 percent in 1974; 25 percent in 1975; and 25 percent in 1976. The expenses incurred by petitioner in administering the Blue Cross/Blue Shield benefits accounted for the following percentages of its total expenses: 17 percent in 1973; 19 percent in 1974; 20 percent in 1975; and 18 percent in 1976. Some insurance benefits offered by Blue Cross/Blue Shield can only be purchased by a group and cannot be purchased from Blue Cross/Blue Shield by individuals at any price. Also, it is less expensive to purchase insurance benefits as a group than to purchase the equivalent benefits as individuals. Although petitioner qualifies for exemption under section 501(c)(6), it may still be liable for the tax imposed by section 511 if it has any unrelated business taxable income (hereinafter UBTI). Section 512(a)(1) defines UBTI as the gross income derived by an organization from any unrelated *613 trade or business regularly carried on by it, less allowable deductions and other adjustments provided in section 512(b). Subject to a few exceptions not relevant here, section 513(a) defines "unrelated trade or business" as any trade or business the conduct of which is not substantially related (aside from the need of the organization for income or funds or the use it makes of the profits derived) to the exercise or performance of the organization's exempt purpose or function. In accordance with these Code provisions, section 1.513-1(a), Income Tax Regs., states as a general rule that gross income of an exempt organization is includable in the computation of UBTI if: (1) The income is derived from a trade or business; (2) the trade or business is regularly carried on by the organization; and (3) the conduct of the trade or business is not substantially related (other than through the production of funds) to the organization's performance of its exempt function. Petitioner concedes that the first two requirements for finding income to be UBTI are satisfied here, i.e., by sponsoring and administering the Blue Cross/Blue Shield insurance programs, it was *614 regularly carrying on a trade or business. [2] Thus, the only question to be resolved here is whether petitioner's promotion and administration of the Blue Cross/Blue Shield group insurance plans was "substantially related" to its exempt purpose. Petitioner contends that the exempt purpose of a business league is to promote some common business interest and that a business interest common to every commercial endeavor is to maintain a stable and permanent staff of employees. Petitioner contends further that its making available Blue Cross/Blue Shield insurance at economical rates helped its members attract and retain a competent group of employees. Respondent counters by arguing that the exempt purpose of petitioner did not encompass the provision of *615 personal benefits such as low-cost insurance, to its members or their employees, and therefore, that there is no basis for finding that the conduct of the insurance activities had a causal relationship to the achievement of exempt purposes, as required by section 1.513-1(d)(2), Income Tax Regs.[3] Furthermore, respondent contends that even if there was some relationship between the providing of health insurance and petitioner's exempt purpose, that relationship would not be "substantial" because petitioner has failed to show that its offering and administration of the insurance plans actually enabled its members to retain quality employees and that its members and their employees could not have otherwise obtained the benefits afforded by the plans sponsored by petitioner. *616 We agree with respondent. Like this case, Professional Insurance Agents of Michigan v. Commissioner, 78 T.C.     (Feb. 17, 1982), involved an exempt business league that sponsored group insurance plans in return for a percentage of premiums paid by members who subscribed to such plans. The Professional Insurance Agents endorsed or promoted to its members several different group insurance programs underwritten by private insurance companies. With respect to one of these insurance plans, the group health and life plan, the association also undertook administrative services similar to those performed by petitioner in this case, including distributing brochures and applications, reviewing and forwarding to the insurance company applications and claims, disbursing claim drafts and certificates of coverage to members, and acting as an intermediary in disputes between its members and the insurance company. We found the evidence supported the Professional Insurance Agents' assertion that participating members were benefited by the group insurance programs. Nevertheless, we concluded that the organization failed to show that its insurance activities "contributed directly and *617 importantly to the improvement of conditions in a particular line of business." Supra, slip op. at 42. We found instead that the insurance activities did little more than generate revenue for the association and provide members with a convenient and economical service in operation of their agencies. Therefore, we held that the net income from the insurance activities was UBTI. The purpose of the Long Island Gasoline Retailers Association, as stated in its constitution, Article I, Section II, is to unite Long Island Gasoline retail dealers under its leadership "for the effective and successful pursuit of a better life and future of all gasoline dealers." This is, to say the least, a broadly stated and ambiguous purpose; however, it is given clearer definition by the objectives set forth in Article II. The twelve listed objectives deal with improving relations among the member gasoline stations and improving relations between member gasoline station owners and consumers, suppliers, and other outsiders. Although the objectives listed in Sections I through XII of Article II are not intended to be exhaustive, it is significant that in no way do the listed objectives imply that *618 the purpose is to provide benefits to only some of the member gasoline stations or employees, owners or shareholders of only some members. Furthermore, the stated purpose of the organization should be interpreted in the light of the organization's exemption under section 501(c). One of the requirements that a business league must satisfy to qualify for exemption is that its activities must be directed toward the improvement of business conditions of one or more lines of business as opposed to the performance of particular services for individual persons. Sec. 1.501(c)(6)-1, Income Tax Regs.; Professional InsuranceAgents of Michigan v. Commissioner,supra, slip op. at 41. Thus, for purposes of applying to "substantially related" test of section 1.513-1(d)(2), Income Tax Regs., we view petitioner's exempt purpose as being to advance the common business interests of Long Island gasoline retailers rather than to directly benefit shareholders or owners of members or the employees of individual gasoline stations. This *619 purpose is similar to the Professional Insurance Agents' purpose to advance the common business interests of independent insurance agents. In Professional Insurance Agents we held that services aimed at improving the availability of group insurance plans do not contribute to the improvement of business conditions and, therefore, do not relate to the organization's exempt purpose. See also Associated Barbers andBeauticians v. Commissioner,69 T.C. 53, 70 (1977), in which we found that an organization did not qualify for exemption under section 501(c)(6) because the bulk of its activities, including the sponsorship and administration of group insurance plans, did not contribute to the improvement of business conditions in the hairstyling profession but instead constituted "particular services" benefiting individual members. Although Professional Insurance Agents and AssociatedBarbers and Beauticians did not explicitly address the specific argument advanced by petitioner here--that the industry's business conditions as a whole benefited because the members' ability to retain quality personnel improved, they implicitly rejected this argument *620 by finding that the availability of group insurance plans did not contribute to any improvement in common business conditions even though members who subscribed to the group insurance did derive particular benefits. Assuming arguendo that the availability of the Blue Cross/Blue Shield insurance did help some gasoline stations retain competent employees, the only members of petitioner who would actually derive this benefit would be those members whose employees actually subscribed to the plans. Only these particular members, and not the group as a whole, could be seen as deriving any benefit from petitioner's sponsoring the insurance plans. Furthermore, that the individual subscribers paid in proportion to the insurance received strongly indicates that the provision of group insurance did not benefit the group as a whole. See Evanston-North Shore Board of Realtorsv. United State,162 Ct. Cl. 682, 320 F.2d 375 (1963); LouisianaCredit Union League v. United States,501 F. Supp. 934, 941 (E.D. La. 1980). Because Professional Insurance Agents and Associated Barbers and Beauticians establish that providing group insurance coverage *621 does not relate to an organization's exempt purpose, regardless of whether similar insurance might have been otherwise available to an organization's members, we do not need to resolve the factual controversy whether petitioner actually showed that insurance similar to the plans sponsored by it would not have been available otherwise to its members and their employees. We note, though, that the record in this stipulated case is virtually devoid of evidence supporting petitioner's contention. None of the stipulated facts or exhibits even address whether insurance companies other than Blue Cross/Blue Shield made comparable insurance available on a group or individual basis and whether petitioner's members and their employees might have had other opportunities to subscribe to group insurance plans, Blue Cross/Blue Shield, or otherwise.
Therefore, we find that petitioner's sponsorship and administration of group insurance plans did not substantially relate to its exempt purpose. Accordingly, petitioner's income from its insurance activities, less allowable deductions, is UBTI subject to tax under section 511(a). Decision will be entered for the respondent.
Footnotes
*. This case was tried before Judge Cynthia H. Hall, who subsequently resigned from the Court. By Order of the Chief Judge, dated January 13, 1981, this case was reassigned to Judge Meade Whitaker↩ for disposition.
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended.↩
2. Were petitioner to contend otherwise, such an argument would be bound to fail in the light of our opinion in Professional Insurance Agents of Michigan v. Commissioner,↩ 78 T.C.     (Feb. 17, 1982), in which we found that an exempt organization that promoted group insurance programs was regularly carrying on a trade or business, regardless of whether its promotional activities could be characterized as merely passive.
3. Section 1.513-1(d)(2), Income Tax Regs., provides: Trade or business is "related" to exampt purposes, * * * only where the conduct of the business activities has causal relationship to the achievement of exempt purposes (other than through the production of income); and it is "substantially related," for purposes of section 513, only if the causal relationship is a substantial one. Thus, for the conduct of trade or business from which a particular amount of gross income is derived to be substantially related to purposes for which exemption is granted, the production or distribution of goods or the performance of the services from which the gross income is derived must contribute importantly to the accomplishment of those purposes. * * *↩